IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

JAMES TURNER,

Plaintiff,

v.

PHILIP HOECHST, MEREDITH MASHAK, CHARLES FACKTOR, CINDY O'DONNELL, and LUCAS WOGERNESE,[1]

Defendants.

OPINION & ORDER

15-cv-23-jdp

---

Plaintiff James Turner, a prisoner in the custody of the Wisconsin Department of Corrections at the Columbia Correctional Institution, brings claims that defendant prison officials terminated his back and leg therapy ordered by a doctor, and then did not reinstate the therapy after he filed a grievance. Defendants have filed a motion for summary judgment, stating that Turner's therapy was discontinued because he missed two of the appointments, and that the other defendants acted appropriately in responding to Turner's complaints. I will grant defendants' motion for summary judgment because Turner fails to show that any of them acted with deliberate indifference to his back and leg problems.

## FINDINGS OF FACT

I draw the following facts from the parties' proposed findings and evidence in support.

Plaintiff James Turner is incarcerated at the Columbia Correctional Institution (CCI). Defendant Phillip Hoechst works at CCI as a physical therapist. Defendant Meredith Mashak was the Health Services Unit manager at CCI. The remaining defendants examined

---

1 I have amended the caption to reflect the proper spelling of defendant Hoechst's name.

Turner's grievance about his medical care: Lucas Wogernese was the institution complaint examiner at CCI, Charles Facktor was a corrections complaint examiner for the Wisconsin Department of Corrections (DOC), and Cindy O'Donnell was the DOC secretary's "designee" making the final decision on grievances.

On June 24, 2014, after a medical exam, a physician assessed Turner with sciatica, which is "pain that radiates along the path of the sciatic nerve, which branches from [a person's] lower back through [his or her] hips and buttocks and down each leg."[2] The doctor referred him to physical therapy for evaluation and treatment of lower back-sciatica pain for six to eight weeks.

On July 14, 2014, Hoechst saw Turner for an initial physical therapy evaluation. Turner described sore, achy, intermittent pain in the left buttock into his thigh with an intensity of 8 out of 10 at that time and 9 out of 10 at its worst. Turner said the pain was aggravated by lying down and went away on its own. After the initial evaluation, Hoechst concluded that physical therapy was appropriate for Turner. Hoechst's "plan of care" was to see Turner once a week for six weeks, recheck symptoms as needed, and to provide him with stretches he could do on his own, other information, and ultrasound treatment. That day, Turner and Hoechst signed a "Physical/Occupational Therapy Service Agreement" form stating:

> I, the undersigned, understand that the Department of Corrections, Bureau of Health Services, has approved my physician's request for physical or occupational therapy services. I agree to fully comply with the instructions of the physical or occupational therapist by following the prescribed exercise

2 *See* http://www.mayoclinic.org/diseases-conditions/sciatica/basics/definition/con-20026478.

> program on my own time. I understand that physical or occupational therapy services may be terminated if I fail to fully cooperate with the program.

Dkt. 38-1, at 18.

Turner's first session with Hoechst was on July 21, 2014. Turner stated that he had pain in his leg and knee with an intensity of 5 to 7 on a 10-point scale. He denied having back pain. Hoechst found that Turner had "full trunk active range of motion." Hoechst applied ultrasound treatment to Turner's left iliotibial band (tissue running from the hip to knee),[3] and led him through stretches. Hoechst made a plan to have Turner continue "home" stretches and follow up the next week. Turner also received an x-ray of his lumbar spine that day. The x-ray showed "normal alignment, no fracture or dislocation, no significant degenerative disease, and normal regional soft tissues."

On July 30, 2014, Turner did not attend his scheduled physical therapy session. Turner was at recreation instead. Turner says he did not attend the session because the officer whose duty it was to inform him he had a "will call pass" to attend therapy did not tell him that.

A prisoner violates DOC regulations when he is in an area to which he is not assigned. Defendants say that HSU staff makes of list of the inmates they will be seeing the next day, third-shift security staff completes will-call passes overnight, and the passes are "disbursed" to the each prisoner's unit "so staff and the inmates are aware of the appointment and the inmate is able to attend the appointment." A prisoner who has a pass is supposed to wait in

---

3 *See* http://www.mayoclinic.org/diseases-conditions/knee-pain/symptoms-causes/dxc-20190116.

the unit until his appointment. Turner says, "Any time an inmate have [a] pass for anywhere, it's the officer job to inform that inmate."

Hoechst rescheduled Turner for next available appointment, on August 6, and Turner attended his session that day. Turner said that he had occasional pain in his knee of 7 on a 10-point scale, but that "the tape" helped his pain. (I take this to be the "kinesiotape" mentioned below.) Turner reported no back problems. Turner had full trunk motion and "did not reproduce pain in the left thigh," which I take to mean that he did not experience it during the session. Hoechst believed that Turner's symptoms were iliotibial-band related and not the nerve or lower back pain for which he was originally referred. Turner received ultrasound treatment and kinesiotape on his left knee and leg. Hoechst's plan was for Turner to tape his knee for three days and to continue stretching.

Turner's next scheduled therapy session was August 13, 2014. But Turner again did not attend and went to recreation instead. Turner again says that his failure to attend was the fault of the officer who failed to tell him he had a "will call" pass to attend therapy that day. Hoechst discontinued the physical therapy due to Turner's non-compliance with the recommended treatment. On the discharge documentation, Hoechst noted that Turner's participation in the home exercise program was poor, but that he did have full range of motion in the lumbar flexion and extension.

Hoechst says that to obtain optimal treatment benefits from therapy for problems like Turner's, the patient has the responsibility to perform the home exercises as prescribed and also to attend therapy to receive treatment and to receive any adjustments to the home exercises. There is a waitlist for inmates to receive therapy, so if patients are skipping appointments that need to be rescheduled, it causes delays in therapy for other patients.

Based on his experience as a physical therapist, Hoechst says that discharging Turner was appropriate because Turner (1) had not been following the plan of care; (2) had poor home exercise compliance; (3) missed two of four scheduled therapy appointments; (4) was fully able to complete all of his activities of daily living (such as dressing, walking, showering, and eating) without pain; (5) could walk without a noticeable limp; (6) was able to attend and participate in recreation; (7) had full trunk range of motion, so his level of impairment was quite minimal; and (8) had stated that the pain "went away on its own."

Turner submitted an inmate grievance in mid-September 2014, stating, "One of health service staff canceled my therapy treatment ordered by the doctor." As the institution complaint examiner, defendant Wogernese investigated Turner's allegations. He contacted defendant Mashak about Turner's claims. Mashak responded as follows:

> I have reviewed the inmate medical record. Inmate was ordered Physical Therapy x 6 for low back pain and hip pain on July 14, 2014. Inmate was evaluated by physical therapy on 7/14/14. Inmate was seen by physical therapy on 7/21, but was a no show @ rec1 on 7/30. Inmate was seen by physical therapy on 8/6 but was a no show @ rec1 on 8/13. On 8/13 physical therapist wrote progress note that physical therapy was discontinued for noncompliance.

Wogernese recommended dismissing the complaint because therapy was canceled due to Turner's noncompliance. The reviewing authority, the health services nursing coordinator, accepted that recommendation and dismissed the grievance.

Turner filed an appeal stating that "there [were] no pass[es] given to Turner or there was pass for Turner on the pass list even though Turner missed them two dates." Dkt. 39-2, at 15. Defendant corrections complaint examiner Facktor's recommendation stated:

> In agreement with the report of the Institution Complaint Examiner, noting the complaint has been reviewed and decided by the BHS Regional Nursing Coordinator, and that the inmate

> has provided no new information on appeal to warrant recommending overturning that decision, it is recommended this appeal be dismissed.

*Id.*, at 17.[4] Defendant O'Donnell reviewed this recommendation for the Office of the Secretary and accepted the decision.

Once a patient is discharged from therapy, a referral from a doctor is needed to restart therapy. Turner made several requests about his therapy being canceled and his leg hurting, including one to Mashak, who told him to contact the doctor. He was seen by a doctor in January, who placed him back on therapy for sciatica. Turner received therapy from defendant Hoechst six times in January and February 2015.

## ANALYSIS

Turner brings claims under the Eighth Amendment for defendant's Hoechst's decision to terminate his prescribed back and leg therapy, and the other defendants' role in the denial of his grievances about the termination. The Eighth Amendment prohibits prison officials from acting with deliberate indifference to prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976). A "serious medical need" may be a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584-85 (7th Cir. 2006). A medical need may be serious if it is life-threatening, carries risks of permanent serious impairment if left untreated, results in needless pain and suffering, significantly affects an individual's daily activities, *Gutierrez v. Peters*, 111 F.3d 1364, 1371-73 (7th Cir. 1997), or otherwise subjects

---

[4] Turner argues that defendants' summary judgment motion should be denied because Facktor did not provide testimony in conjunction with the motion. But Facktor's CCE ruling on Turner's grievance speaks for itself, so he was not required to present further testimony.

the prisoner to a substantial risk of serious harm. *Farmer v. Brennan*, 511 U.S. 825, 847 (1994).

To be considered "deliberately indifferent," an official must know of and disregard "an excessive risk to an inmate's health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Snipes v. Detella*, 95 F.3d 586, 590 (7th Cir. 1996). However, inadvertent error, negligence, gross negligence, and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).

Defendants initially argue that they should be granted summary judgment because Turner's problems were not a serious medical need. But Turner was diagnosed with sciatica. Defendants point to tests or observations indicating that his lower back appeared normal, and that his symptoms seemed to fluctuate—sometimes reporting back pain and other times not. They compare Turner's symptoms to "sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue," Dkt. 36, at 10 (quoting *Cooper v. Casey*, 97 F.3d 914, 916 (7th Cir. 1996), and argue that "even *Turner* did not consider his back and leg condition enough to rise to" a serious medical need, because he chose to skip two of his four appointments, *id*. (emphasis in original).

But the severity of Turner's condition is a dispute of material fact that cannot be resolved at summary judgment. The tests or observations cited by defendants raise the inference that perhaps Turner does not have a nerve problem. But Turner was diagnosed with sciatica and defendants do not say that the diagnosis was revoked; in fact, Turner ended up getting more therapy after it was reinstated by a doctor. He consistently reported significant

pain (between 7 and 10 on a 10-point scale), and the fact that the pain came and went does not mean he had no medical need. And defendants' statement that Turner chose to skip his appointments is disputed by Turner: he says he was not given proper notice of his passes.

Where Turner's claims falter is the deliberate indifference element. Turner contends that defendant Hoechst interfered with the doctor's prescribed treatment by canceling further therapy sessions. But Hoechst was tasked in part with evaluating Turner's problems, and he canceled further therapy only after he thought that Turner had skipped two appointments of his own volition. Hoechst cannot be deliberately indifferent for terminating therapy that Turner was not taking seriously: there is no point in having therapy sessions if the patient does not show up. This is particularly so where Hoechst had concluded that Turner's level of impairment was minimal, that he could complete his daily activities, and that the pain would go "away on its own," so there was little reason to think that Turner would suffer without the appointments. And as Hoechst points out, no-show appointments only waste the time of the therapists, who had a wait list for treatment.

Turner argues that he *did* take the therapy seriously and that his failure to appear for the two appointments was through no fault of his own, but rather the fault of the staff member tasked with telling Turner that he had passes for those days. Turner stresses that as a prisoner, he is not free to go wherever he pleases, so without the pass, he could not go to his appointments. Neither side fully explains whether a prisoner knows about the specific date and time of an appointment before the pass is issued to the prisoner, and thus how much responsibility Turner had for ensuring he had a pass, but ultimately this point is immaterial. There is no evidence that *Hoechst* was aware of the reason for Turner's no-shows, which means that no reasonable juror could conclude that Hoechst acted with deliberate

indifference toward Turner. It was reasonable for Hoechst to terminate Turner given that he thought Turner was choosing not to attend treatment and instead attending recreation.

But even if I had concluded that Turner's version of events was sufficient to establish an Eighth Amendment violation, Hoechst would still be entitled to summary judgment on a qualified immunity defense. Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). In deciding whether a right is "clearly established," courts ask "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). A plaintiff bears the burden of establishing that the constitutional right was clearly established. *Volkman v. Ryker*, 736 F.3d 1084, 1090 (7th Cir. 2013). Although the plaintiff need not point to a case directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 131 S.Ct. 2074, 2083 (2011). "In other words, 'the plaintiff must demonstrate either that a court has upheld the purported right in a case factually similar to the one under review, or that the alleged misconduct constituted an obvious violation of a constitutional right.'" *Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 915 (7th Cir. 2015) (quoting *Lunini v. Grayeb*, 395 F.3d 761, 769 (7th Cir. 2005)).

I conclude that Turner fails to show a clearly established constitutional right violated by defendants here. Turner does not present a closely analogous case; he presents only cases vaguely discussing Eighth Amendment standards. Nor does my own research reveal clearly established law indicating that medical professionals must persist in a course of treatment when they believe the prisoner patient is choosing not to cooperate with that treatment, or

suggesting that the medical professional needs to perform an independent investigation to ensure that a patient's no-shows were truly voluntary.

Stated another way, any violation by Hoechst was not clear enough to overcome the benefit of the doubt he receives under the qualified immunity doctrine. *See Findlay v. Lendermon*, 722 F.3d 895, 899 (7th Cir. 2013) ("Qualified immunity protects public servants from liability for reasonable mistakes made while performing their public duties."); *see also Kikumura v. Turner*, 28 F.3d 592, 597 (7th Cir. 1994) ("[T]he point of qualified immunity and its 'clearly established' requirement is that government officials are not, as a rule, liable for damages in close cases."). Therefore, I will grant defendants' motion for summary judgment on Turner's Eighth Amendment claim against Hoechst.

The remainder of the defendants were involved with Turner's inmate grievance about the cancellation of his therapy. Defendant institution complaint examiner Wogernese contacted HSU Manager Mashak, who reviewed Turner's medical file. Mashak reported that Turner no-showed for therapy twice, and Hoechst discontinued treatment for Turner's noncompliance. Wogernese, Facktor, and O'Donnell relied on Mashak's report in denying Turner's grievance.

Mashak was not deliberately indifferent by examining the records and relaying the reason stated in those records for the cancellation of therapy. She accurately restated those records. If Turner is upset with the *depth* of Mashak's investigation, he has at best stated a negligence claim against Mashak for not exploring further to find out more about the termination for noncompliance.

Complaint examiners Wogernese, Facktor, and O'Donnell in turn relied on Mashak's report relaying Hoechst's record of the appointments. These examiners were entitled to rely

on Mashak's report and Hoechst's statements in the underlying records in discontinuing the treatment. *See Johnson v. Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006) (explaining that when a prison official investigates medical complaints and reasonably defers to a medical professional, the official incurs no liability); *see also Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) ("As a nonmedical administrator, Peterman was entitled to defer to the judgment of jail health professionals so long as he did not ignore Berry."). Again, Turner may have thought that the examiners did not do enough to investigate, but that is not enough to maintain a deliberate indifference claim given that the examiners relied on medical professionals to explain what happened.

Finally, after the grievance, Turner wrote to Mashak about being reinstated onto the therapy list and she told him to raise the issue with his doctor. That was the normal procedure to have therapy reinstated, so no reasonable jury could conclude that this response showed deliberate indifference on Mashak's part.

ORDER

IT IS ORDERED that defendants Charles Facktor, Phillip Hoechst, Meredith Mashak, Cindy O'Donnell, and Lucas Wogernese's motion for summary judgment, Dkt. 35, is GRANTED. The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered March 28, 2017.

BY THE COURT:

/s/

JAMES D. PETERSON
District Judge